[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 1, 2005
THOMAS K. KAHN
CLERK

No. 00-13811
_____

D.C. Docket No. 93-01090-CV-ORL-19C


NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK),
CSX TRANSPORTATION, INC.,

> Plaintiffs-Cross-Defendants-Counter- Defendants-
> Cross-Appellants-Cross-Appellee,

AMERICAN HOME ASSURANCE COMPANY,
f.u.b.o. Stewart and Stevenson Services, Inc.,

> Plaintiff-Appellant-Cross-Appellee,

> versus

ROUNTREE TRANSPORT AND RIGGING, INC.,

> Defendant-Cross-Defendant-Appellee,

KISSIMMEE UTILITY AUTHORITY,

> Defendant-Cross-Claimant-Cross-Defendant-
> Counter-Claimant-Counter-Defendant-Third-
> Party-Plaintiff-Third-Party-Defendant-Appellee-
> Cross-Appellant,

WOKO TRANSPORTATION,
BLACK AND VEATCH, ET AL,

Defendants-Cross-Claimants-Cross-Defendants-
Counter-Claimants-Counter-Defendants-Third-
Party-Plaintiffs-Third-Party-Defendants-
Appellees,

FLORIDA MUNICIPAL POWER AGENCY,

Defendant-Cross-Claimants-Cross-Defendants-
Counter-Claimant-Counter-Defendant-Third-
Party-Plaintiff-Third-Party-Defendant-Appellee-
Cross-Appellant,

GENERAL ELECTRIC COMPANY, INC.,

Consolidated Defendant-Third-Party Defendant-
Appellee-Cross-Appellant,

STEWART AND STEVENSON SERVICES, INC.,

Movant-Cross-Appellant.

_____

94-Cv-976-Orl-19C:

AMERICAN HOME ASSURANCE COMPANY,
f.u.b.o. Stewart and Stevenson Services, Inc.,

Plaintiff-Counter-Defendant-Appellant-
Cross-Appellee,

versus

NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK),
CSX TRANSPORTATION, INC., ET AL,

Defendants-Appellees-Cross-Appellants,

2

ROUNTREE TRANSPORT AND RIGGING, INC.,

Defendant-Cross-Defendant-Appellee,

KISSIMMEE UTILITY AUTHORITY,

Defendant-Appellee-Cross-Appellant,

FLORIDA MUNICIPAL POWER AGENCY,

Movant-Appellee-Cross-Appellant,

GENERAL ELECTRIC CO.,

Movant-Appellee-Cross-Appellant,

STEWART AND STEVENSON SERVICES, INC.,

Movant-Cross-Appellant.

_____

No. 00-13986
_____

D.C. Docket No. 93-01090-CV-ORL-19C

NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK),
CSX TRANSPORTATION, INC.,

Plaintiffs-Cross-Defendants-Counter-Defendants,

versus

ROUNTREE TRANSPORT AND RIGGING, INC.,

Defendant-Cross-Defendant-Appellee,

3

KISSIMMEE UTILITY AUTHORITY,

> Defendant-Cross-Claimant-Cross-Defendant-Counter-Claimant-Counter-Defendant-Third-Party-Plaintiff-Third-Party-Defendant,

WOKO TRANSPORTATION,

> Defendant-Cross-Claimant-Cross-Defendant-Counter-Claimant-Counter- Defendant- Third-Party-Plaintiff-Third-Party-Defendant,

BLACK AND VEATCH, ET AL,

> Defendant-Cross-Claimant-Cross-Defendant-Counter-Claimant-Counter- Defendant-Third- Party-Plaintiff-Third-Party-Defendant-Appellant,

FLORIDA MUNICIPAL POWER AGENCY,

> Defendant-Cross-Claimants-Cross-Defendants-Counter-Claimant-Counter-Defendant-Third-Party-Plaintiff-Third-Party-Defendant,

GENERAL ELECTRIC CO.,

> Third-Party-Defendant-Appellee.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

**(September 1, 2005)**

Before TJOFLAT and BIRCH, Circuit Judges, and GOLDBERG[*], Judge.

---

[*] Honorable Richard W. Goldberg, Judge, U.S. Court of International Trade, sitting by designation.

BIRCH, Circuit Judge:

This case returns to us for disposition from the Supreme Court of Florida, to which we certified four questions of Florida state law. See Nat'l R.R. Passenger Corp. v. Rountree Transp. & Rigging, Inc., 286 F.3d 1233, 1258, 1269 (11th Cir. 2002). Based on the Florida Supreme Court's responses to the certified questions, see Am. Home Assurance Co. v. Nat'l R.R. Passenger Corp., __ So. 2d __ (Fla. 2005) (per curiam), the district court's disposition of the certified issues is **AFFIRMED**.

## I. BACKGROUND

This appeal arises from a series of lawsuits that were filed after a passenger train of the National Railroad Passenger Corporation ("Amtrak") collided with a hauler rig owned and operated by Rountree Transport and Rigging, Inc. ("Rountree") on railroad tracks owned by CSX Transportation, Inc. ("CSX") and licensed to Kissimmee Utility Authority ("KUA"). While the facts of the case are fully described in our previous opinion, see Nat'l R.R. Passenger Corp., 286 F.3d at 1237-42, we will recount here relevant facts to provide context for our disposition of the case.

KUA, a municipal agency charged with constructing and operating the electrical utilities of the City of Kissimmee, Florida, was responsible for the

construction of the Cane Island Power Plant ("Plant"). To finance the Plant's construction, KUA partnered with the Florida Municipal Power Agency ("FMPA"), which acquired a 50% ownership interest in the Plant as a result of its participation. Because pedestrian and vehicular access to the Plant would require crossing railroad tracks owned by CSX, KUA entered into a Private Road Grade Crossing Agreement ("Crossing Agreement") with CSX in which CSX gave KUA a license to construct, use, and maintain a private road grade crossing over CSX's railroad tracks. In exchange for the license, KUA agreed in the Crossing Agreement to "defend, indemnify, protect and save [CSX] harmless from and against [designated losses and casualties]." Id. at 1238. In addition, KUA agreed in the Crossing Agreement to "defend and indemnify any company whose property was 'operated' by CSX at the railroad crossing." Id.

In order to outfit the Plant, KUA contracted with General Electric Company ("GE") for the purchase and delivery of a combustion turbine and its related implements. In their agreement, GE promised to defend and indemnify KUA "to the extent of and on account of any negligent act or omission of [GE] in" purchasing and delivering the turbine. Id. (internal quotations omitted). GE then contracted with Stewart and Stevenson Services, Inc. ("S&S") for the purchase and customization of the turbine and related parts. S&S in turn contracted with WOKO

6

Transportation ("WOKO"), a transportation broker, to deliver the customized turbine equipment. WOKO ultimately contracted with Rountree to have the turbine and its housing enclosure delivered to the Plant.

On 30 November 1993, en route to the Plant with the turbine and its enclosure, Rountree came to the railroad crossing licensed to KUA by CSX. Realizing that the height of the rig would have to be adjusted prior to traversing the crossing, the Rountree workers stopped the rig on the tracks to make the necessary adjustments. Before the rig was removed from the tracks, however, an Amtrak passenger train collided with the rig, destroying the rig, the turbine, and its enclosure, as well as causing damage to the train and some of its passengers.

Litigation ensued. After a three-week jury trial on the issue of liability for all claimants and all defendants in the consolidated cases, the jury found Rountree was 59% at fault for the collision, CSX was 33% at fault, and Amtrak was 8% at fault. In addition, the district court found that the transportation of the turbine was an inherently dangerous activity, and therefore WOKO, S&S, and GE were vicariously liable for Rountree's negligence. The district court had also granted summary judgment in favor of CSX and Amtrak on their arguments that KUA was contractually obligated under the Crossing Agreement to defend and indemnify them in this litigation. Further, the district court granted summary judgment in

7

favor of GE on the claims of KUA and FMPA that GE was obligated to indemnify them for their expenses in defending themselves in the turbine litigation. A jury trial on the issue of damages followed, after which many of the parties settled their claims. The American Home Assurance Corporation ("AHA"), however, which was the subrogee of S&S, had not settled its claims. After AHA rested its case-in-chief as to its damages, several parties moved for the district court to direct a verdict in favor of AHA against Rountree, CSX, and Amtrak in the amount of $1,851,822.40, which represented 41% of the damages they argued AHA had proven at trial.[1] The district court granted the motion and directed judgment in favor of AHA in the amount of $1,851,822.40.

The instant appeal followed. AHA appealed, inter alia, the district court's determination that FLA. STAT. ch. 768.81 applied and limited its recovery to 41% of its proven damages. In addition, KUA and FMPA appealed the district court's determination that the Crossing Agreement contractually obligated them to defend and indemnify CSX and Amtrak. They argued, inter alia, that sovereign immunity precluded the enforcement of the terms of the Crossing Agreement. Because these

---

[1] Their argument was based on FLA. STAT. ch. 768.81, the Florida comparative fault statute. Under the statute, in cases where multiple parties are at fault, damages awarded to prevailing parties are reduced by their percentage of fault. Id. Because Rountree was found to be 59% at fault, and because Rountree's fault could be apportioned to S&S, and hence AHA, through vicarious liability, the parties argued that AHA's recovery was limited to 41% of its proven damages.

issues presented unanswered questions of Florida law that were not specifically addressed by Florida precedent, we certified four questions to the Supreme Court of Florida. We now proceed to address the certified questions and the Florida Supreme Court's responses in turn.

## II. DISCUSSION

A. <u>Florida's Comparative Fault Statute</u>

On appeal, AHA argued that the district court improperly applied Florida's comparative fault statute, FLA. STAT. ch. 768.81, in determining that its recovery was limited to 41% of its proven damages. Particularly, AHA argued that the fault of Rountree, an active tortfeasor, could not be apportioned to AHA, which was vicariously liable, under the comparative fault statute because "§ 768.81 applies solely to parties who are directly negligent, and that a party who is only vicariously liable cannot have fault apportioned to him under § 768.81." <u>Nat'l R.R. Passenger Corp.</u>, 286 F.3d at 1254. Because the resolution of the parties' contentions on this issue was not clear from Florida precedent, we certified the following question to the Supreme Court of Florida:

> SHOULD A VICARIOUSLY LIABLE PARTY HAVE THE NEGLIGENCE OF THE ACTIVE TORTFEASOR APPORTIONED TO IT UNDER FLORIDA STATUTE § 768.81 SUCH THAT RECOVERY OF ITS OWN DAMAGES IS REDUCED CONCOMITANTLY?

9

Id. at 1258. After considering the issue, the Florida Supreme Court responded to the question in the affirmative. See Am. Home Assurance Co., __ So. 2d at __ (slip op. at 22). Noting that the statute provides that "any contributory fault chargeable to the claimant diminishes proportionately" the amount the claimant may recover, FLA. STAT. ch. 768.81(2) (emphasis added), the court determined that the statute "must be read to include parties other than those that are directly liable, and thus [the statute] applies to vicariously liable parties such as AHA." Am. Home Assurance Co., __ So. 2d at __ (slip op. at 22). Because the Florida Supreme Court concluded that FLA. STAT. ch. 768.81 was properly applied to limit AHA's recovery to 41% of its proven damages, the district court's application of the statute and its award of damages to AHA are affirmed.

B. Indemnification Under the Crossing Agreement

1. Sovereign Immunity

KUA and FMPA also appealed the district court's determination that, under the Crossing Agreement, they were obligated to defend and indemnify CSX and Amtrak. KUA and FMPA argued, inter alia, that state sovereign immunity principles precluded the district court's determination as to their indemnity obligation. Specifically, they argued that sovereign immunity could only be waived by an act of the Florida legislature, and that the legislature had waived

10

sovereign immunity in the area of torts in FLA. STAT. ch. 768.28, but only under specified circumstances and only up to $100,000 per claimant or $200,000 per accident. See Nat'l R.R. Passenger Corp., 286 F.3d at 1265. Because the Crossing Agreement purportedly required KUA and FMPA to defend and indemnify CSX above these statutorily-permitted limits, KUA and FMPA argued that the indemnification portion of the Crossing Agreement should not be given effect. Id. Because the applicability of FLA. STAT. ch. 768.28 was unclear under Florida law, we certified three related questions to the Supreme Court of Florida:

> GIVEN THAT KISSIMMEE UTILITY AUTHORITY, A MUNICIPAL AGENCY UNDER FLORIDA LAW, AGREED BY CONTRACT TO INDEMNIFY A PRIVATE PARTY, IS THE AGREEMENT CONTROLLED BY THE RESTRICTIONS ON WAIVER OF SOVEREIGN IMMUNITY FOUND IN FLORIDA STATUTE § 768.28?

> IS THE INDEMNIFICATION AGREEMENT INSTEAD CONTROLLED BY THE RULE FOR BREACH-OF-CONTRACT ACTIONS ENUNCIATED IN PAN-AM TOBACCO CORP. V. DEPARTMENT OF CORRECTIONS, 471 So. 2d 4 (Fla. 198[4])?

> IF PAN-AM APPLIES, DOES A MUNICIPAL AGENCY LIKE KISSIMMEE UTILITY AUTHORITY LOSE THE PROTECTION OF SOVEREIGN IMMUNITY ONLY IF IT HAS SPECIFIC STATUTORY AUTHORIZATION TO ENTER INTO INDEMNIFICATION AGREEMENTS, OR IS IT SUFFICIENT THAT THE AGENCY MORE GENERALLY HAS STATUTORY AUTHORIZATION TO CONTRACT WITH PRIVATE PARTIES?

Id. at 1269.

11

The Supreme Court of Florida answered the first of these questions in the negative. See Am. Home Assurance Co., __ So. 2d at __ (slip op. at 30). The court reasoned that, under the plain language of the statute, FLA. STAT. ch. 768.28 applies when a plaintiff is seeking to recover damages in tort. Id. at __ (slip op. at 29). In contrast, the court found that the indemnification provision at issue in this case was "based on a contract between KUA and CSX," namely, the Crossing Agreement. Id. (emphasis in original). Accordingly, the court found that FLA. STAT. ch. 768.28 was inapplicable.

The court answered the second of these certified questions in the negative as well. Id. at __ (slip op. at 30). Noting that Pan-Am involved the contractual liabilities of the State of Florida, the court found the case inapplicable in the instant case which involved municipal entities. See id. The court noted that "municipalities have long possessed both the power to execute contracts and the concomitant liability for their breach." Id. The court proceeded to note that "the parties have failed to identify any law prohibiting KUA from executing the [C]rossing [A]greement and the indemnification provision it contains." Id. at __ (slip op. at 33). As a result of the court's conclusion that Pan-Am did not apply in the instant litigation, the court declined to answer the last certified question. Id. at __ n.6 (slip op. at 35).

12

2. Additional Arguments Against Indemnification

The court's finding that sovereign immunity does not insulate KUA and FMPA from its indemnification obligations under the Crossing Agreement, however, does not end our inquiry. In our previous opinion, we noted that KUA and FMPA made additional arguments against the district court's grant of partial summary judgment in favor of CSX and Amtrak on the issue of the validity of the Crossing Agreement. But, because an affirmative finding of sovereign immunity from the Florida Supreme Court would have been dispositive, we reserved our determination on these arguments. See Nat'l R.R. Passenger Corp., 286 F.3d at 1264. Accordingly, we now address those additional arguments. In making our determination, we note that the district court's grant of partial summary judgment is reviewed de novo, and its findings of fact are reviewed for clear error. Burnes v. Pemco Aeroplex, Inc., 291 F.3d 1282, 1284 (11th Cir. 2002).

First, KUA and FMPA argued that the indemnification provision in the Crossing Agreement is invalid because its terms do not satisfy the requirements in FLA. STAT. ch. 725.06. Under the statute in place at the time the Crossing Agreement was executed, a contract for construction of an appurtenance in which one party agrees to indemnify and hold harmless an owner of the real property on which the appurtenance is constructed must contain: (1) a monetary limitation on

13

the extent of the indemnification; or (2) specific consideration given by the indemnified party to the indemnitor. See FLA. STAT. ch. 725.06 (1993). Assuming without deciding that the statute applied to the Crossing Agreement, we note the Supreme Court of Florida stated in its opinion that KUA's agreement to indemnify was given "[i]n recognition of the increased risks associated with the use of CSX's property, tracks, and right-of-way and as part of the 'consideration' for receiving this license." Am. Home Assurance Co., __ So. 2d at __ (slip op. at 34). In addition, the court stated, "the indemnification agreement is binding and enforceable." Id. In this circuit, a state supreme court's answer to certified questions is "conclusive" on the issue certified. Nat'l Educ. Ass'n v. Lee County Bd. of Pub. Instruction, 467 F.2d 447, 450 (5th Cir. 1972). Moreover, upon receiving an answer to a certified question, our "court does not second-guess a State's application of its own law." Id. at 450 n.6. Thus, although we did not certify to the Florida Supreme Court a question about the validity of the Crossing Agreement's indemnity provision vis-a-vis FLA. STAT. ch. 725.06, we decline to second-guess the court's determination that KUA received consideration for its agreement to indemnify CSX and that the Crossing Agreement is enforceable. See id.; see also Redgrave v. Boston Symphony Orchestra, Inc., 855 F.2d 888, 903 (1st Cir. 1988) (en banc) (noting that determinations made by a state court other than

14

those in direct response to certified questions should be carefully considered by certifying court).  Moreover, this conclusion coincides with our own review of Florida state law.  As one Florida court noted, "[t]he 'specific consideration' required by section 725.06(2) need not be a dollar amount."  Peoples Gas System, Inc. v. RSH Constructors, Inc., 563 So. 2d 107, 109 (Fla. Dist. Ct. App. 1990); see Westinghouse Elec. Corp. v. Turnberry Corp., 423 So. 2d 407, 409 (Fla. Dist. Ct. App. 1982) (finding agreement to deliver elevators ahead of schedule constituted "specific consideration" within the meaning of the statute).  Accordingly, although the Crossing Agreement did not specify a dollar amount as consideration, CSX's grant of a license to use the crossing to access the Plant and the allowance of increased risk attendant to such use constituted consideration necessary to satisfy FLA. STAT. ch. 725.06.  Accordingly, we reject the argument of KUA and FMPA that the statute rendered the indemnity provision in the Crossing Agreement void.

Second, KUA and FMPA argued that the district court erred in granting summary judgment on the indemnification issue because a genuine issue of material fact existed as to whether the indemnity provision constituted an exculpatory clause unenforceable under Florida law.  Particularly, they argued that a fact question existed as to whether CSX held a superior bargaining position in negotiating the Crossing Agreement.  As we noted previously, the Florida Supreme

15

Court in its answer to our certification stated that "the indemnification agreement is binding and enforceable." Am. Home Assurance Co., __ So. 2d at __ (slip op. at 34). Also as we noted previously, we are disinclined to second-guess the determination of the Florida Supreme Court in light of this clear language in its opinion. See Nat'l Educ. Ass'n, 467 F.2d at 450 n.6. Moreover, the Florida Supreme Court has previously determined that a railroad's receipt of an indemnification agreement as consideration for granting a license to use a crossing over its tracks did not demonstrate the use of superior bargaining power such that the indemnification agreement was rendered unenforceable. See Russell v. Martin, 88 So. 2d 315, 317-18 (Fla. 1956); see also Jacksonville Terminal Co. v. Ry. Express Agency, Inc., 296 F.2d 256, 262-63 (5th Cir. 1961) (citing Russell and concluding that an indemnification agreement offered by a Florida terminal company which owned railroad tracks to a shipping company as part of a lease to use the tracks did "not violate public policy"). Accordingly, we reject the argument of KUA and FMPA that a fact question existed as to whether CSX exercised a superior bargaining position in negotiating for the indemnity provision which therefore rendered the Crossing Agreement invalid.

Third, KUA and FMPA argued that the indemnity provision in the Crossing Agreement was inapplicable to the facts of this case because the negligent actions

16

of CSX occurred in a location separate and removed from the railroad crossing where the accident occurred. Particularly, they argued that because the negligence apportioned to CSX stemmed from the omissions of its personnel in Jacksonville, Florida, the liability of CSX was not sufficiently connected to the crossing to trigger the indemnity provision. The Crossing Agreement provided that KUA agreed to indemnify CSX for "all claims and liability . . . arising out of, resulting from, or connected in any manner with the . . . use . . . of said [c]rossing . . . regardless of cause." See R1-187, Ex. A at ¶ 14.2. Here, CSX's liability stemmed from claims which arose from the 1993 collision at the crossing. Thus, because we conclude such claims were covered by the all-encompassing language in the indemnity provision, we reject as meritless the argument of KUA and FMPA that the indemnity provision was inapplicable.

Fourth, KUA and FMPA argued that the district court improperly granted partial summary judgment in favor of Amtrak by finding that Amtrak was a beneficiary of the indemnity agreement between KUA and CSX. Under the terms of the indemnity provision, KUA agreed not only to indemnify CSX, but also "'any other company . . . whose property at [the crossing] may be leased or operated by the undersigned [CSX],' as well as 'any parent, subsidiary or affiliated system companies of [CSX].'" Nat'l R.R. Passenger Corp., 286 F.3d at 1263

17

(quoting the Crossing Agreement). Citing the undisputed fact that "[w]hen an Amtrak train was moving on CSX track it was subject to CSX rules and regulations and its movement was controlled by CSX dispatchers," R109-2183 at 7, the district court concluded as a matter of law that the Amtrak train was "operated" by CSX at the time of the collision as defined in the Crossing Agreement. KUA and FMPA have not disputed the district court's factual finding as to CSX's control over Amtrak trains. See Burnes, 291 F.3d at 1284; see also United Transp. Union v. CSX Transp., Inc., 902 F.2d 36 (6th Cir. 1990) (unpublished table decision) (describing how CSX was able to "control rail traffic" using its tracks through "train orders" and "proceed signals"). Moreover, we agree with the district court that this finding was sufficient to support the conclusion that, as a matter of law, CSX was "operating" the Amtrak train as defined in the Crossing Agreement at the time of the collision. Under Florida contract law, where the contract terms are clear and unambiguous, a court must give effect to the plain meaning of the terms. See Burns v. Barfield, 732 So. 2d 1202, 1205 (Fla. Dist. Ct. App. 1999). Courts may resort to reference materials to determine the accepted plain meaning of a particular term. See id. (relying on dictionary definition of "third party"). Such inquiry reveals that "operate" is defined as "to cause to occur"; "to cause to function"; "to manage and put or keep in operation." WEBSTER'S THIRD NEW

18

INTERNATIONAL DICTIONARY 1580-81 (1993). Based on this definition, coupled with the district court's undisputed factual finding that CSX dictated how Amtrak trains functioned and managed the trains' operations, we conclude as a matter of law that CSX "operated" the Amtrak trains as defined in the Crossing Agreement. Moreover, we note that the Crossing Agreement provided indemnity for claims arising from the "use" of the crossing by "any other company" whose property was operated by CSX. See R1-187, Ex. A at ¶¶ 1.2, 14.2. Because it is undisputed that Amtrak trains were at all times before and after the execution of the Crossing Agreement regularly using the CSX tracks, we find that the construction of the indemnity agreement offered by KUA and FMPA would effectively render these provisions mere surplusage. See Hargrave v. Hargrave, 728 So. 2d 366, 367 (Fla. Dist. Ct. App. 1999) (noting that "[e]very provision in a contract should be given meaning and effect" to avoid rendering any provision "mere surplusage"). Accordingly, we conclude the district court properly concluded that CSX "operated" the Amtrak train involved in the collision as defined in the Crossing Agreement, thereby triggering the duty of KUA and FMPA to indemnify Amtrak.

In sum, then, based on the Supreme Court of Florida's opinion and our determinations in this opinion, we conclude that the district court did not err in finding that the indemnity provision in the Crossing Agreement obligated KUA

19

and FMPA to indemnify both CSX and Amtrak. Accordingly, the district court's grant of partial summary judgment on this issue in favor of CSX and Amtrak is affirmed.

### III. CONCLUSION

In this appeal, we were called upon to review the district court's orders in light of the responses to four questions we certified previously in this case to the Supreme Court of Florida. Based on the Florida Supreme Court's determinations and our analysis of the parties' remaining arguments, we have concluded that the district court properly applied the Florida comparative fault statute, FLA. STAT. ch. 768.81, to limit AHA's recovery to 41% of its proven damages, and properly concluded that the indemnity provision in the Crossing Agreement obligated KUA and FMPA to indemnify CSX and Amtrak. Accordingly, the district court's disposition of the certified issues is **AFFIRMED**.